

_____

No. 3:18-CV-644-CWR-FKB

K.B., *a Minor Child, c/o Lenda Burns, Legal Guardian*, et al.

*Plaintiffs,*

*v.*

OFFICER RAKASHA ADAMS, et al.

*Defendants.*

_____

ORDER

_____

Before CARLTON W. REEVES, *District Judge*.

Before the Court are motions for summary judgment filed by the City of Jackson, Officer Eric Morris, and Officers Rakasha Adams and Albert Taylor, jointly; the Plaintiffs' motion for leave to file a sur-reply; and two motions *in limine*. The motions are fully briefed and ready for adjudication.

## I.  Background

In the early daylight hours of January 27, 2018, Crystalline Barnes was driving her red Pontiac in Jackson, Mississippi. City of Jackson Police Officer Rakasha Adams says she observed Ms. Barnes run a stop sign, causing another vehicle to run off the road. After checking on the passengers of the other vehicle, Officer Adams began to pursue Ms. Barnes.

Both vehicles traveled at low speeds, under the speed limit. Officer Adams received information from dispatch that the owner of the red Pontiac was Ms. Barnes and that the vehicle was not reported stolen. Other than the traffic violation Officer Adams says she observed, no crime or suspicious activity was associated with either the vehicle or Ms. Barnes. Nevertheless, what happened next resulted in Ms. Barnes' death.

The events that led up to the fatal shooting are heavily disputed. On top of the disputes between the plaintiffs and the defendants, there are significant evidentiary conflicts among the defendants stemming from their internally inconsistent statements. In addition, no audio or video evidence from vehicle dashboard or body cameras has been provided to this Court.

Here is an early example of the conflicts. In her initial incident report, Officer Adams stated that she initiated her blue lights and siren. But her affidavit submitted in this litigation says otherwise: her siren was not working. We see the same problem in the report of Officer Albert Taylor, who joined the pursuit after Officer Adams radioed him for backup. In his incident report, Officer Taylor stated that he activated his blue lights and siren. In a subsequent affidavit, though, Officer Taylor stated that he did not activate either. Because Ms.

2

Barnes did not appear to be evading and traffic was very light, he deemed the blue lights and siren unnecessary.

Returning to Officer Adams, she states that when she initiated her blue lights and siren, Barnes did not stop. According to the incident report, Ms. Barnes ran other stop signs and traffic lights. Those specific traffic violations are not mentioned in Officer Adams' affidavit, however.

In any event, while engaged in her pursuit of Ms. Barnes, Officer Adams called Officer Taylor for assistance. The pursuit lasted about four minutes and for a distance of approximately two miles. At some point, Officer Taylor lost sight of Officer Adams and Ms. Barnes. In his affidavit, he states that after losing sight of them, he returned to his "beat."

From Officer Adams' incident report we learn that Ms. Barnes made a left westbound turn on Fernwood Avenue. Officer Taylor approached in the eastbound direction of the same road. It is unclear whether Officer Taylor had actually returned to his beat at the time he encountered Officer Adams and Ms. Barnes again.

Officer Adams, in her incident report, states that as Ms. Barnes made the left onto Fernwood Avenue, Ms. Barnes *lost control* of the vehicle and hit the curb. Docket No. 129-2. Officer Adams explained in her affidavit that Officer Taylor was "approaching in his lane from across the street [when Ms. Barnes'] Pontiac accelerated and ran into [Officer] Taylor's car head-on." Docket No. 131-1. Officer Adams felt like Barnes *had intentionally run into* Officer Taylor's vehicle. *Id*. With respect to the curb, Officer Taylor's incident report states he saw Ms. Barnes hit the curb, but his affidavit describes the turn without any mention of her hitting the curb.

3

And with respect to the accident itself, the Plaintiffs have a competing narrative. They attribute the contact to the rainy weather conditions.

The Plaintiffs also describe what happened next differently. They state that after Ms. Barnes hit the curb, she attempted to accelerate away from the curb. They say that this is when Officer Taylor crossed from the eastbound lane into the westbound lane, positioning his patrol car against traffic, and collided with Ms. Barnes.

Despite their different versions of the collision, the parties do acknowledge that a collision occurred. Officer Taylor's patrol car sustained traces of red paint and a crack in the bumper.

The Plaintiffs then state that as Ms. Barnes attempted to drive away from the curb, Officer Adams exited her vehicle and began shooting at the driver's side of Ms. Barnes' vehicle.[1] In an attempt to escape the gunfire, they say, Ms. Barnes began to make a U-turn to re-position her vehicle east. The Plaintiffs state that this is when Officer Taylor exited his vehicle and (also) from the driver's side, began shooting at the driver side of Ms. Barnes' vehicle. The Plaintiffs state that as Ms. Barnes turned her car around, driving east and *away from* Officers Adams and Taylor, *both officers continued shooting*. Within

---

[1] Ms. Barnes is dead. She is not present to provide her account. *See Stewart v. City of Euclid, Ohio*, No. 18-3767, 2020 WL 4727281, at *9 (6th Cir. Aug. 14, 2020) (Donald, J., concurring in part and dissenting in part) ("At the outset, I note that the Court is left with a one-sided account of the events from the officers' perspective since Rhodes ended Stewart's life. Further, officers did not activate dash cameras, body cameras, or any recording devices upon approaching Stewart."). The Plaintiffs' evidence comes from a forensic expert report they commissioned.

seconds, Ms. Barnes hit a utility pole and came to a stop. She had sustained two gunshot wounds and died from a shot to the back of her neck. Twenty-three shots had been fired.

Unsurprisingly, the officers' affidavits and incident reports present a very different version of these events. Officer Adams says that after Ms. Barnes hit the curb, Ms. Barnes accelerated towards Officer Taylor's patrol car. Then, after her vehicle hit Officer Taylor's patrol car and he exited the vehicle, Ms. Barnes attempted to run him over. Officer Adams began to shoot at Ms. Barnes' vehicle to defend her colleague. Officer Adams' incident report also mentions that after Ms. Barnes drove towards Officer Taylor, she placed her vehicle in reverse and accelerated backwards towards Officer Adams. But, if one only reads Officer Adams' affidavit, you will find no threats on her life.

Officer Taylor stated that after Ms. Barnes' vehicle collided with his patrol car, he exited his vehicle and ordered Ms. Barnes out of the car. He states that Ms. Barnes instead put her vehicle in reverse before accelerating towards him. He then drew his weapon and fired at her. In his deposition, he stated that he believes he was the first one to fire his weapon. Lastly, Officer Taylor states that Ms. Barnes then accelerated towards Officer Adams. He fired his weapon again in fear for their lives.

The Plaintiffs' expert report says JPD's investigation found that a total of 23 shots were fired. Of those, 17 were fired by Officer Adams and 6 by Officer Taylor. A total of 19 bullets hit Ms. Barnes' vehicle. Two struck Ms. Barnes. The bullets hit her lower back and the back of her neck. All of the shots

were fired at the sides and rear windshield of her vehicle. Not one shot was fired at the front of the vehicle.

The City's version of events cannot be entirely reconciled with that of the Officers', either. Its brief states that "the driver of the Pontiac made a right turn toward the curb and then reversed its direction, at a high rate of speed, toward Officer Taylor." At this point, the City states that Officers Adams and Taylor began shooting at Ms. Barnes as she "put the vehicle in reverse and accelerated the vehicle toward Officer Adams." This description makes it sound as if Ms. Barnes drove in reverse twice in a row.

Following the incident, both officers were placed on administrative leave pending internal and criminal investigations. Both officers were found in violation of the City's General Order on police pursuits, for (1) failure to inform the communications center that they were involved in a pursuit, and (2) failure to adhere to the policy of pursuing only violent felons.

The Plaintiffs state that Officers Adams and Taylor also failed to comply with Jackson Police Department's policy of notifying dispatch that shots had been fired. And get this: Officers Adams and Taylor instead reported that a vehicle was on fire and requested the Fire Department.

At the time of the incident, Officer Adams had been a police officer for fewer than two years and Officer Taylor for approximately 18 years. Ms. Barnes' fatal shooting was the second shooting for Officer Adams within a three-month period. As a result of the prior shooting, Officer Adams was placed on administrative leave pending an investigation. Ultimately, the City asserts that Officer Adams' force in the prior

shooting was found to be justified.[2] The Plaintiffs state that Officer Adams nevertheless described herself as having emotional numbness, increased arousal, difficulty sleeping and concentrating, feelings of jumpiness, and easy irritability and anger. They argue that at the time Officer Adams returned to work, she was unfit for duty.

The Plaintiffs have also sued an Officer Morris. What was his role? They say that Officer Morris conspired with Officers Adams and Taylor to falsify a police report. They state that after arriving on the scene, Officer Morris agreed to write a police report that was purposefully misleading and included inaccurate allegations.

The Jackson Police Department's Major Investigations Division submitted Officer Adams and Officer Taylor's names to the District Attorney for consideration of murder charges. No charges were ultimately filed.

After discovery, the parties filed motions for summary judgment, a motion for leave to file a sur-reply, and motions *in limine*.

## II.  Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute is one where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact

---

[2] The parties each discuss this incident in their filings, but the record evidence on it is scant.

is material if it "might affect the outcome of the suit under the governing law." *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citation omitted).

The Court views the evidence and draws reasonable inferences in the light most favorable to the non-movant. *Duval v. N. Assur. Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013). If after doing so, no evidence exists that allows reasonable inferences supporting the nonmoving party's position, then summary judgment must be granted. *St. Amant*, 806 F.2d at 1297.

### III.   Discussion

### A.   Claims Against the City of Jackson

In *Monell v. Department of Social Services of City of New York*, the Supreme Court cleared the way for local governments to be sued directly under 42 U.S.C. § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. 658, 690 (1978).

Holding a local government liable under *Monell* requires a showing that (1) an official policy or custom existed, (2) of which a policymaker in that body can be "charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002).

### 1.   Custom of Using Deadly Force

### a.   Policymaker

The Plaintiffs first argue that the City of Jackson Police Department has a custom of using deadly force on fleeing

suspects and moving vehicles who do not pose a sufficient threat of harm—an act in violation of the suspects' Fourth Amendment rights. As the final policymaker, the Plaintiffs identify the Mayor.

For purposes of a § 1983 claim, a policymaker is someone who is responsible "for making law or setting policy in any given area of a local government's business." *Valle v. City of Hous.*, 613 F.3d 536, 542 (5th Cir. 2010) (quotation marks and citation omitted). Municipal liability will attach only when the policymaker has "final authority to establish municipal policy with respect to the action ordered." *Id.* (quotation marks and citation omitted). Determining whether a policymaker possesses final policymaking authority for purposes of § 1983 municipal liability is a question of state and local law. *Id.*

Here, the Plaintiffs identify Mayor Lumumba as the policymaker for the Jackson Police Department. However, the record coupled with this Court's precedent support the finding that the Chief of Police is the final policymaker for the City of Jackson Police Department. *See* Docket No. 129-7 at 3; *Simmons v. City of Jackson, Miss.*, No. 3:18-CV-714-CWR-LRA, 2020 WL 888057, at *1 (S.D. Miss. Feb. 24, 2020).[3]

A policymaker is one who "decide[s] the goals for a particular city function and devise[s] the means of achieving those goals." *Webb v. Town of Saint Joseph*, 925 F.3d 209, 217 (5th Cir. 2019). James Davis, the Chief of Police for the Jackson Police

---

[3] The Plaintiffs attempt to support their arguments in a proposed sur-reply, but on review it is not clear why their argument was not made in their response brief. Accordingly, their motion for leave to file a sur-reply is denied.

Department, testified in his deposition that he is in charge of shaping and setting all policies for the Jackson Police Department. He also stated that the Mayor has no oversight authority over the Jackson Police Department and no authority to fire a police officer. Similarly, Lieutenant Wade, the City of Jackson's corporate designee, stated in his deposition that the Chief of Police is the final person in charge of deciding any disciplinary action for an officer within the Department. Docket No. 129-6 at 13.

In light of the evidence before the Court and supporting precedent, this Court finds that, at the time the events of this case took place, the Chief of Police was the final policymaker for the Jackson Police Department. *Accord Simmons*, 2020 WL 888057, at *1.

### b.  Similar Incidents

The Plaintiffs then argue that the City of Jackson has a custom of shooting at suspects fleeing or in moving vehicles who do not pose a sufficient threat to the officers or the public, an action in violation of the Fourth Amendment.

A custom is defined as a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984).

If a custom is alleged, "actual or constructive knowledge of such custom" must be attributable to the governing body or to someone else to whom policy-making authority was delegated. *Angel v. La Joya Indep. Sch. Dis't*, 717 F. App'x 372, 378 (5th Cir. 2017). "Constructive knowledge may be attributed to

the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities." *Pineda*, 291 F.3d at 330 (citation omitted). This arises, for example, "where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity." *Id.*

The Plaintiffs point this Court to six prior shootings they believe demonstrate persistent and widespread violations. They argue that these instances, which were similar to Ms. Barnes', show that the Jackson Police Department has a custom of using excessive force in situations involving a suspect in a moving vehicle or fleeing.

Showing that a custom exists requires proving "similarity and specificity" between the case at hand and the prior events identified. *Hicks-Fields v. Harris Cty., Tex.*, 860 F.3d 803, 810 (5th Cir. 2017) (citation omitted). Previous acts identified "cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question." *Id.* (quotation marks and citation omitted) ("While the specificity required should not be exaggerated, our cases require that the prior acts be fairly similar to what ultimately transpired."). For a pattern to exist, a plaintiff must show "sufficiently numerous prior incidents, as opposed to isolated instances." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009) (quotation marks and citation omitted).

The Plaintiffs cite six incidents between 2010 and 2016. They argue that these incidents all have one common denominator: the vehicle or suspect involved was fleeing or moving away from the officer at the time the officer discharged his or her firearm. The City of Jackson responds that the incidents cited

do not establish a pattern. It disputes the Plaintiffs' evidence and gives its own version of those events. Additionally, it argues that six incidents are not enough to constitute a pattern considering that Jackson is the capitol city of Mississippi.

Turning to the cited incidents, Plaintiffs have identified three incidents where an officer shot at a suspect who was walking or running away from the officer, and three incidents in which the officer shot at a moving vehicle. All six incidents involve several other facts which the parties dispute. This Court will not and cannot make determinations of credibility as to what happened during those six incidents. It instead takes the evidence presented on those incidents and, viewing it in the light most favorable to the Plaintiffs, determines whether they reveal a genuine dispute for trial on the issue of custom.

The first incident the Plaintiffs identify took place in December 2010. There, the Plaintiffs present an interview conducted by a Jackson Police Department Detective with a witness to the shooting. The interview describes an officer chasing a suspect on foot followed by shots being fired. The City presented an incident report by the officer who describes that after chasing the suspect, he fell to the ground and the suspect approached him with something large in his hands, causing him to fire his weapon.[4]

Next, in the January 2011 incident, an officer shot at a suspect as he ran away. The officer thought that the suspect was

---

[4] The City also argues that the internal affairs investigation found the force to be necessary in that circumstance, but this assertion is not substantiated with any evidence in the record.

shooting at him, but in actuality, another officer's weapon had accidentally discharged. The Mississippi Court of Appeals found that the officers involved acted with reckless disregard and denied immunity.

This was followed by the October 2012 incident. The officer there shot at an individual suspected of stealing from a Dollar General. The suspect was walking away from the officer and heading towards the store's door when he was shot. The officer was terminated for violating the Jackson Police Department's policies and procedures.

The parties then discuss incidents in May 2013 and January 2016. The evidence presented on the May 2013 incident reveals conflicting testimony from witnesses and officers as to whether the suspect fishtailed and reversed towards the officer. The internal investigation was inconclusive. The January 2016 incident, meanwhile, involved an officer shooting at a moving vehicle as it backed up and hit the officer's patrol car. The parties do not present any evidence indicating the findings of the internal investigation.

The last incident the Plaintiffs identify is the February 2016 incident involving Officer Taylor, one of the defendants in this case. There, Officer Taylor shot at the windshield of a car alleged to have been driving towards him. Although the City argues that nobody was injured in this instance, they provide no evidence of that assertion. The parties do not present evidence on the findings of the internal investigation.

The six instances identified, rather than representing *all* excessive force claims against JPD officers, represent the narrower, more specific scenario of JPD officers shooting at suspects in moving vehicles or fleeing. Viewing the evidence in the light

favorable to the non-movant, these examples are fairly similar to the evidence in this case. As in the cited incidents, the Officers in this case shot at Ms. Barnes' moving vehicle. Further, the Plaintiffs have presented evidence that Ms. Barnes was attempting to get away from the officers at the time of the shooting.

The City also had actual or constructive knowledge of these incidents. Its own statements indicate that it is the Department's policy to conduct an internal investigation whenever an officer uses deadly force while on duty.

Given the specific type of force used in all of these cases and the narrow factual circumstances of when it was deployed, this Court finds a genuine issue of material fact on this element of this *Monell* claim.[5] Consequently, it is up to a jury to weigh the evidence and make ultimate determinations of credibility about a custom of excessive force.

### c.  Moving Force

The last inquiry under *Monell* is whether a "direct causal link between the municipal policy and the constitutional deprivation" exists. *Piotrowski v. City of Hous.*, 237 F.3d 567, 580 (5th

---

[5] In addition, although the Plaintiffs do not present any evidence on this, "the size of a police department may be relevant to determining whether a series of incidents can be called a pattern." *Peterson*, 588 F.3d at 852. Here, JPD's website states that it has "budgeted positions for 402 sworn officers." *See* Jackson Police Department, The City of Jackson Mississippi, https://www.jacksonms.gov/departments/jackson-police-department/ (last visited Aug. 3, 2020).  Similarly, the Defendants may be permitted to argue and introduce evidence showing that these six incidents over a six-year period are not sufficiently numerous to show a custom or practice, but are instead merely isolated incidents.

Cir. 2001). The Plaintiffs must establish both the "causal link (moving force) and the City's degree of culpability (deliberate indifference to federally protected rights)." *Id.* (quotation marks and citation omitted).

The Plaintiffs argue that JPD's custom of officers shooting at suspects in moving vehicles or suspects who are fleeing deprives those individuals of their Fourth Amendment rights, and deprived Ms. Barnes of the same right. The City has not established that the allegations against the officers in the six incidents were unfounded. It also has not presented evidence to rebut the Plaintiffs' argument that shooting at moving vehicles and fleeing suspects violates those suspects' Fourth Amendment rights.

"Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404–05 (1986). "[P]roof that a municipality . . . has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Id.*

For summary judgment purposes, the Plaintiffs have met their burden on this element. The available evidence indeed suggests that Jackson Police Department's custom of shooting at suspects who are in moving vehicles or fleeing violates the suspects' Fourth Amendment rights and was the moving force of the constitutional violation in this case.

Having satisfied all three requirements of their *Monell* claim against the City, the City's motion for summary judgment as to the Plaintiffs' claim of a custom of excessive force is denied.

### 2.   Custom of Failing to Supervise, Train, or Discipline

The Supreme Court recognizes that in limited circumstances, a municipality's failure to train its "employees about their legal duty to avoid violating citizens' rights" may constitute an official municipal policy for purposes of § 1983. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The municipality's failure to train "must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* (quotation marks and citation omitted).

Deliberate indifference is a tough standard to satisfy. It requires proof that the government actor "disregarded a known or obvious consequence of his actions." *Brown v. Bryan Cty., Okla.*, 219 F.3d 450, 457 (5th Cir. 2000). It is the municipality's inaction in light of notice that its employees are causing constitutional violations that becomes the functional equivalent of an official city policy to violate the Constitution. *Connick*, 563 U.S. at 61–62.

Here, the Plaintiffs argue that even though the City was aware of the danger of officers shooting at fleeing suspects and moving vehicles, as well as the regularity with which it happened at the Jackson Police Department, the City offered no specialized training. They argue that the City did nothing to deter or properly train its officers on the practice and instead provided them only with a written policy.

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Bryan Cty.*, 520 U.S. at 409. The Plaintiffs have identified six instances where JPD officers shot at fleeing suspect or moving vehicles. It is the Department's policy that officers not shoot at moving

16

vehicles "except when every other reasonable means of defense has been exhausted" and the officer's life or the life of others would be in imminent danger if the suspect is not stopped. Docket No. 129-4 at 5. It is also Departmental policy to not shoot fleeing suspects unless they are a fleeing felon who represent an "imminent threat of death" or "serious bodily harm" to the officer or others. *Id.*

The evidence at hand suggests that JPD has a system in which it takes action when an officer uses deadly force. That cuts against the Plaintiffs' argument that the City is deliberately indifferent. On the other hand, however, one cannot ignore the possibility that a police department that investigates itself has the means and motive to be deliberately indifferent in the way it conducts those investigations. However, with the current evidentiary record, this Court lacks sufficient information about a pattern of inadequate thoroughness of JPD's internal procedures to allow an inference that the City was deliberately indifferent in failing to supervise, train, or discipline its officers in these situations. *See Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003).

Because the Plaintiffs have failed to demonstrate a genuine dispute of material fact on this claim, the City's motion for summary judgment is granted as to Plaintiffs' cause of action for failure to train, supervise, or discipline its employees.

### 3.  Negligent Retention, Discipline, and Supervision

Next up are the Plaintiffs' state-law claims against the City of Jackson. These claims are brought pursuant to the Mississippi Tort Claims Act (MTCA). The MTCA "'is the exclusive civil remedy against a governmental entity or its employee for tortious acts or omissions which give rise to a suit.'" *Young v.*

17

*Isola, Miss.*, 708 F. App'x 152, 157 (5th Cir. 2017) (quoting *Elkins v. McKenzie*, 865 So. 2d 1065, 1073 (Miss. 2003)).

The Plaintiffs primarily argue[6] that the City failed to train its police officers to ensure that they follow the Jackson Police Department's General Orders. They further argue that the City failed to correct or attempt to stop Jackson Police Department police officers from violating its General Orders. The Plaintiffs point to the deposition of Lieutenant Joseph Wade—the City of Jackson designee—in which Lieutenant Wade states that the Jackson Police Department does "not train to shoot at moving vehicle [sic] or at moving objects. When we train, we're shooting at a affixed silhouette." Docket No. 144-1 at 7.

The MTCA provides that a government entity is not liable for any claim "[b]ased upon the . . . the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused." Miss. Code Ann. § 11-46-9(1)(d). To determine what a discretionary function is, the first inquiry is "whether the conduct involved an element of choice." If so, the next step is to "determine whether that choice or judgment involved social, economic, or political-policy considerations." *City of Jackson v. Sandifer*, 107 So. 3d 978, 984 (Miss. 2013).

---

[6] The plaintiffs did not respond to the City's argument that it is entitled to summary judgment on the MTCA claim regarding the recklessness of this shooting. *See* Docket No. 130 at 22-23. Accordingly, they have abandoned the claim. *See Acadia Ins. Co. v. Hinds Cty. Sch. Dist.*, No. 3:12-CV-188-CWR-LRA, 2013 WL 2182799, at *5 (S.D. Miss. May 20, 2013).

The Mississippi Supreme Court has found that training and supervising police officers is a discretionary function. *City of Clinton v. Tornes*, 252 So. 3d 34, 39 (Miss. 2018). The court had "no doubt that the choice to employ and the manner of supervision of police officers does affect public policy." *Id.* It firmly concluded that "[t]he manner in which a police department supervises, disciplines and regulates its police officers is a discretionary function of the government." *Id.*

The City's failure to train its officers on shooting at moving vehicles is therefore not one for which the City can be held liable. The City's motion for summary judgment is granted as to the Plaintiffs' state law claim for negligent retention, discipline, and supervision.

### 4.  Civil Conspiracy

The Plaintiffs did not oppose the City's motion for summary judgment on this claim. Therefore, the City's motion is granted as to the Plaintiffs' civil conspiracy claim.

### B.  Claims Against Officers Adams, Taylor, and Morris

### 1.  Excessive Force Claim as to Officers Adams and Taylor

The Plaintiffs bring an excessive force claim against Officers Adams and Taylor in their individual capacities When excessive force is alleged to have occurred in the course of an encounter with police, the federal right at issue is the Fourth Amendment's right against unreasonable seizures. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

Officers Adams and Taylor have invoked the defense of qualified immunity. The doctrine of qualified immunity shields police officers from civil liability when their conduct did not violate "clearly established statutory or constitutional rights

of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted); *see generally Jamison v. McClendon*, --- F. Supp. 3d ---, 2020 WL 4497723, at *13 (S.D. Miss. Aug. 4, 2020).

At the summary judgment stage, courts engage in a two-prong inquiry to resolve questions of qualified immunity. *Tolan*, 572 U.S. at 655. The first prong asks whether the facts, when viewed in the light most favorable to the party opposing summary judgment, show that the officer's conduct violated an individual's right either under a federal statute or the Constitution. *Id.* at 656.

The second prong then asks whether that federally-guaranteed right was clearly established. *Id.* The Supreme Court, in clarifying the second prong, has stated that "[it] do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308.

### a. Violation of Ms. Barnes' Fourth Amendment Rights

A claim that a police officer used excessive force in the course of an "arrest, investigatory stop, or other 'seizure'" must be judged by reference to the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 387 (1989).

In this case, Ms. Barnes died from a gunshot wound to the back of her neck resulting from her encounter with Officers Adams and Taylor. Her death is plainly a seizure within the meaning of the Fourth Amendment. *Scott v. Harris*, 550 U.S. 372, 381 (2007) ("[A] Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied.").

The reasonableness of the officer's force requires balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tenn. v. Garner*, 471 U.S. 1, 8 (1985) (citation omitted). Relevant factors are the severity of the crime committed, whether the suspect posed an imminent threat to the safety of the officers or the public, and whether the suspect was resisting arrest or evading arrest by fleeing. *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 411 (5th Cir. 2009). This inquiry considers whether the officer's actions were "'objectively reasonable' in light of the facts and circumstances confronting them," and takes into account the fact that police officers sometimes must make split-second decisions about the amount of force necessary in a situation. *Graham*, 490 U.S. at 387.

Officers Adams and Taylor argue that their actions were not excessive in light of the threat Ms. Barnes posed. In their motion for summary judgment, they seem to indicate that Ms. Barnes posed a threat to Officer Taylor's life at the time they each fired their weapons.

The record quickly reveals many inconsistencies in the Officers' testimony. Their motion for summary judgment makes no mention of the fact that Ms. Barnes' vehicle came to a stop after moving in the opposite direction of the officers' location. Officer Adams and Taylor do not attempt to explain how Ms. Barnes' vehicle ended up heading in the direction opposite from them. However, Officer Taylor's affidavit, deposition, and incident report all indicate that after the vehicles collided, Ms. Barnes turned her car around and began driving away from him. He goes as far as stating that Ms. Barnes turning her vehicle caused him to fire his weapon, as he determined

Ms. Barnes was headed toward and posed a threat to Officer Adams' life. Curiously though, Officer Adams' evidence is contradictory on that point and internally inconsistent. Her incident report alleges that Ms. Barnes *reversed* in her direction, rather than faced her. And she makes no mention of any threat to her life in her affidavit.

Then there is the Plaintiffs' evidence. Based on an affidavit and report submitted by the Plaintiffs' expert, William M. Harmening, the Plaintiffs argue that of the 19 shots that struck Ms. Barnes' vehicle, not one of the shot's trajectories support a claim that either officer shot at the front of the car as it headed towards them. The Plaintiffs do, however, present the expert's evidence that the trajectory of six shots aimed at the rear driver window were fired from behind Ms. Barnes' vehicle as she drove away.

In *Lytle*, the Fifth Circuit found that firing at the back of a fleeing vehicle, in a residential area, and where the officer was not aiming for the driver could be found to be an unreasonable use of force and therefore should be resolved by a jury. 560 F.3d at 412. There, the court found that even if the driver did pose a significant threat of harm to the officer when it backed up towards him, a jury could find that the officer's response to that threat was unreasonable. *Id.* It highlighted that the reasonableness of justifiable force also changes as the situation evolves. *Id.* at 413. While certain force can be justified in one second, its reasonableness can end "if the justification for the force has ceased." *Id.* (citations omitted).

The record shows that Ms. Barnes' vehicle came to a stop approximately three houses away from Taylor's patrol car. The pictures on the record show the area to be residential and in

fact, one of the shots fired hit a house. Ms. Barnes' initial offense was running a stop sign, after which a low-speed pursuit (of no more than 25 mph) commenced. Officer Adams knew that neither Ms. Barnes nor her vehicle were associated with any crimes or suspicious activity.

Additionally, there is the evidence presented as to the initial collision between Officer Taylor and Ms. Barnes. Officer Taylor and Adams' recollection of this event is riddled with inconsistencies. Their story seems to be that Ms. Barnes intentionally drove into Officer Taylor's patrol car. The Plaintiffs argue, however, that the minimal damage to Officer Taylor's patrol car would indicate that Ms. Barnes did not intentionally hit his vehicle but rather attempted to brake as to avoid hitting it. They present pictures showing Officer's Taylor's patrol car in the westbound lane of Fernwood. They argue that Officer Taylor drove his patrol car into the westbound lane into Ms. Barnes' path.

Looking at this evidence in the light most favorable to Ms. Barnes, a jury could determine that Ms. Barnes did not intentionally hit Officer Taylor's patrol car and therefore, in support of their theory that Officer Adams and Taylor's force used in response to the collision was excessive. Moreover, continuing to shoot at Ms. Barnes' vehicle as she drove away, in line with the finding in *Lytle*, could also support a finding that the force used was unreasonable in light of the threat, or lack thereof, to the officers.

> The Fifth Circuit's conclusion in *Lytle* is instructive:
>
> [I]f the facts were as [the officer] alleges—that is, he fired as or immediately after the [vehicle] was backing up toward him—he would likely

23

be entitled to qualified immunity. This is due to the threat of immediate and severe physical harm that the reversing [vehicle] likely posed to [the officer] himself. As discussed below, however, the threat of harm was potentially much different under [the plaintiff's] version of the facts. . . .

Further, . . . [e]ven were we to agree with [the officer] as to the threat the [vehicle] posed, we would be remiss not to consider [the officer's] conduct in response to that threat. It is unclear how firing at the back of a fleeing vehicle some distance away was a reasonable method of addressing the threat. . . . Were a jury to accept [the officer's] version of the facts, it might very well be troubled by [the officer's] act of firing his sidearm at the back of a vehicle three or four houses down the block of a residential area when he was unlikely to have a shot at—and apparently was not aiming for—the driver. A jury might also find that [the officer's] act of firing at a vehicle driving away from him in a residential area posed a risk that the shots might strike an unintended target. Thus, even if we assumed that the [vehicle] posed a significant threat of harm, a jury could conclude that [the officer's] conduct in response to that threat was unreasonable. In other words, under the plaintiff's version of the facts, [the officer's] conduct itself weighs against a conclusion of reasonableness.

*Lytle*, 560 F.3d at 412–13.

This Court, aware that Ms. Barnes is unfortunately not here today to tell her side of the story, takes into account all of the evidence in the record, including the expert testimony which the defendants did not timely oppose. Accepting the Plaintiffs' evidence for present purposes reveals a genuine issue of whether shooting at Ms. Barnes' vehicle was unreasonable. Resolution of that question is for the jury to decide.

### b. The Right Was Clearly Established

The second prong of the qualified immunity inquiry asks "whether the violated constitutional right was clearly established at the time of the violation." *Lytle*, 560 F.3d at 417. Its focus is on whether the officers had "fair warning." *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (quotation marks and citation omitted). "[T]he law can be clearly established 'despite notable factual distinctions between the precedents relied on and the case[] then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Id.* (citation omitted).

While the right to be free from excessive force is "clearly established in a general sense, the right to be free from the degree of force" used in the situation at hand may not have been clearly established to the officer at the time employed. *Id.* Courts should consider the "on-scene perspective rather than the 20/20 vision of hindsight in determining the objective reasonableness of an officer's belief that a certain degree of force was lawful under the circumstances." *Id.* (quotation marks and citation omitted).

Here, the Plaintiffs have demonstrated a genuine issue of material fact as to whether the force used on Ms. Barnes as she

drove away was reasonable. In *Lytle*, the court found that shooting at a vehicle three or four houses down after the vehicle attempted to flee was unreasonable, and the right clearly established. 560 F.3d at 418. There, the suspect was on bond for felony theft and unlawful possession of a weapon. *Id.* at 407. The suspect was also a suspected car thief driving a stolen car. *Id.* Even then, the court found that "absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Id.* at 417; *see also Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

Here, Ms. Barnes' offense was running a stop sign—not a felony. However, what is apparent is that as of January 27, 2018, and based on the Plaintiffs' version of events, Ms. Barnes' constitutional right was clearly established. *Id.*; *see also Goodson v. City of Corpus Christi*, 202 F.3d 730, 739 (5th Cir. 2000) ("summary judgment is inappropriate unless plaintiff's version of the violations does not implicate clearly established law.").

Whether Officer Adams and Taylor's evidence is more credible than Plaintiffs' is a question for the jury. However, at this juncture, granting Officer Adams and Taylor's motion would be premature since the Plaintiffs' version of events could lead a jury to conclude that the Officers violated Ms. Barnes' clearly established constitutional rights.

Finding that a genuine dispute exists, specifically whether shooting at Ms. Barnes' vehicle as it drove away from the officers was reasonable, this Court must deny Officer Adams

and Taylor's motion for summary judgment as to the Plaintiffs' claim of excessive force.

### 2.  Civil Conspiracy Claim Against All Officers

The Plaintiffs did not respond to Officer Morris' motion for summary judgment. Therefore, Officer Morris's motion is granted in its entirety.

The Plaintiffs also did not oppose Officers Adams and Taylor's motion for summary judgment on this cause of action. Therefore, the Officers' joint motion for summary judgment is granted as to the Plaintiffs' civil conspiracy claim.

### C.  The Motions *in Limine*

Many of the issues presented in the motions *in limine* are at first glance more suitable for resolution at trial, when the evidence can be understood with particularity. Regrettably, in the time of this pandemic it is not clear when such a trial can be held. Scheduling a trial for 2020 is looking more difficult day by day. We will discuss this more at the pretrial conference. Given the circumstances, the Court believes that the best course of action is to deny these motions without prejudice to their refiling two weeks before the commencement of trial, when they can be resolved with the evidence at hand and the ruling can be carried consistently through the trial.

### IV.  Conclusion

For the reasons stated above, the City of Jackson's motion for summary judgment is granted in part and denied in part. Officer Morris' motion for summary judgment is granted in its entirety. Officer Adams and Taylors' joint motion for summary judgment is granted in part and denied in part.

27

As for the other motions, the Plaintiffs' motion for leave to file a sur-reply is denied, and the motions *in limine* are denied without prejudice.

SO ORDERED, this the 19th day of August, 2020.

s/ CARLTON W. REEVES
*United States District Judge*

28